UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **DERRICK BARBER,** | ) | |
| | ) | |
| Plaintiff, | ) | No. 23 C 50063 |
| v. | ) | |
| | ) | Hon. Rebecca R. Pallmeyer |
| **PATRICK MOSS and CHELSEA SWORD,** | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM ORDER

Plaintiff Derrick Barber, a prisoner in the custody of the Illinois Department of Corrections, has brought this action under 42 U.S.C. § 1983 against two officials at the Dixon Correctional Center. Barber accuses Patrick Moss, a food service supervisor at Dixon, and Defendant Chelsea Sword, a nurse practitioner, of deliberate indifference to his serious medical need and his request to have meals delivered to his cell as he recovered from knee surgery. Defendants have moved for summary judgment, arguing that the evidence does not support a finding of deliberate indifference on the part of either Defendant. The court agrees. The motions [59], [72] are granted, and the court dismisses this case with prejudice.

## FACTUAL BACKGROUND

On March 22, 2022, Barber underwent knee surgery at the University of Illinois Chicago ("UIC"). UIC doctors performed a right knee arthroscopy including a "loose body debridement and plica excision." (Def. Sword's Statement of Material Facts (Sword SMF) [60] ¶ 8.) In his discharge instructions, the doctors directed that Barber "bear weight as tolerated, extend his right knee through as much range of motion (ROM) as tolerated, and use crutches for the post-operative period." (*Id.*) A surgeon at UIC also told Barber to "be careful" and "not to overdo it." (Pl.'s Resp. to Sword SMF [80] ¶ 8.)

1

On the same day as his surgery, Barber saw an attending nurse at Dixon, who noted that Barber had been provided with crutches, a permit for "lay-in" for 10 days, and Tylenol 3 for pain. (Sword SMF ¶ 9.) An inmate who has a "lay-in" permit is permitted to stay in his cell and is excused from reporting for obligations like job assignments. (*Id.* ¶ 3.) Inmates with lay-in permits normally must still report to the Dixon cafeteria for meals, and to the pharmacy for medications. (*Id.* ¶ 4.) An inmate who is unable to move even with a wheelchair or some other mobility aid may be issued a "feed-in" permit, which allows for meals to be brought directly to their cells.[1] (*Id.* ¶ 6.) An inmate who is unable to get to the pharmacy or the cafeteria is normally housed in the infirmary while he recovers. (*Id.* ¶ 5.)

On March 28, 2022, Barber saw Dr. Larry Sy for a post-surgery appointment. (*Id.* ¶ 10.) Barber reported swelling in his right leg and asked Dr. Sy to give him a lay-in permit, which Dr. Sy gave him. (*Id.*) Sy also referred Barber for an urgent Venous Doppler test at Katherine Shaw Bethea Hospital (KSB) to evaluate the swelling in Barber's leg and screen for deep vein thrombosis (DVT). (*Id.*) As Defendant Sword explained in her affidavit, DVT occurs when a blood clot forms in the body's deep veins and can happen after surgery when patients are on bed rest and resting or sitting too much. (*Id.* ¶ 11.) When Barber saw Nurse Practitioner Susan Tuell the following day, she informed him that he tested negative for DVT, but that he suffered from hemarthrosis, a condition in which blood pools in a joint space, causing pain, swelling, and restricted movement. (*Id.* ¶ 12.) She noted that Barber was "up and about with crutches." (*Id.*)

---

[1] Barber disputes the contention that feed-in permits are only issued to inmates who are gravely ill, pointing to deposition testimony in which he testified that, from March 30, 2022 to April 6, 2022, a corrections officer brought meals to his cell, even though he was not completely immobilized. (Pl.'s Resp. to Sword SMF ¶ 6; Pl.'s Dep. [60-1] 19:8–21:13.) He also offers an affidavit from another inmate, Nolan Watson, who says that he has been receiving meals in his cell for two years because he has an esophageal condition and the doctor wants him to be able to eat his meals slowly. (Pl.'s Ex. C-1 [81] at 8.) He contends, in other words, that Sword is misstating the policy regarding feed-in permits. But, as discussed below, even if the policy regarding feed-in permits is not as ironclad as defendants suggest, Barber cannot establish that he had an objectively serious need for to be fed in his cell, nor can he show that Sword or Moss handled his request for a feed-in permit with deliberate indifference.

She offered to allow him to stay in the infirmary and he agreed. (*Id.*) The next day, he reported that he was "fine" and asked to be discharged from the infirmary. (*Id.* ¶ 13.)

Barber attended a post-surgical follow-up at UIC on April 4, 2022. (*Id.* ¶ 14.) UIC physicians noted that Barber was ambulatory and that his symptoms and pain were normal, given the recent surgery. (*Id.*) Doctors prescribed pain medication and a course of physical therapy. (*Id.*) When Barber saw Dr. Sy again on April 6, 2022, he too ordered physical therapy and, at Barber's request, gave Barber a feed-in permit—using a lay-in permit form, valid for six weeks, on which Sy had handwritten the words "feed-in." (*Id.* ¶¶ 15, 7.)

The involvement of Defendants Moss and Sword in this case did not begin until the following morning, April 7. Defendant Moss, the food service supervisor, sent a breakfast tray to Barber's cell. (Moss SMF [72-1] ¶ 19.) But Barber claims that "Moss decided that he was not going to issue me anymore 'feed-in' meals and called the health care unit to speak to someone" about it; Barber does not identify the source of his information about this phone call. (Barber Aff. [81] at 3, ¶ 7.) Later that day, Barber had an appointment with Defendant Sword, the nurse practitioner, during which he told Sword that Moss had said he would refuse to honor his feed-in permit going forward. (Pl.'s Resp. to Sword SMF ¶ 16; Pl.'s Dep. [60-1] 44:4–13.) After reviewing Barber's chart, Sword determined that meals in his cell were not necessary and invalidated the feed-in permit that Dr. Sy had drawn up the day before. (Sword SMF ¶ 17.) Sword noted that UIC orthopedists had recommended he remain active to facilitate his recovery, and that he had been prescribed physical therapy. (*Id.*) But Barber contends that Sword's decision to invalidate the permit without performing a physical examination and despite his "pleas to her that he was in severe pain" shows deliberate indifference to his serious medical need. (Pl.'s Resp. to Sword SMF ¶ 17.) When Barber protested Sword's decision, she offered him a stay in the infirmary (where meals are delivered to cells) as an alternative, but Barber declined. (Sword SMF ¶ 18.) Because, according to Barber, the conditions in the infirmary are more restrictive than disciplinary segregation, the offer was, in reality, a threat. (Pl.'s Resp. to Sword SMF ¶ 18.).

3

As he recovered from his knee surgery, and without a feed-in permit, Barber continued to attend physical therapy. His recovery progressed well. On April 16, Barber saw a mental health provider, Dr. Maitra, and the two discussed his recent knee surgery. Notes from that visit state: "Surgery was for cartilage repair. Recovery is going well. Reported mood to be frustrated. Was unhappy with the treatment he received after surgery. He wanted more pain medication." (Sword Affidavit Ex. 9 [60-2] at 24.)[2] On April 19, Barber had another visit with Dr. Sy, in which Dr. Sy increased the dosage of his pain medication. (Sword SMF ¶ 21.) He saw Dr. Maitra again on May 16, 2022 and again, among other things, discussed his recovery from knee surgery. Dr. Maitra's notes reflect that Barber told the doctor that "he recovered well and [wa]s no longer in pain." (Sword SMF ¶ 22; Sword Affidavit Ex. 9 [60-2] at 29 ) On several occasions during his recovery from surgery, Barber "walked a nice little distance" to the commissary. (*Id.* ¶ 29 (quoting Pl.'s Dep. 29:13–15).) Barber claims he missed 126 meals in the cafeteria, and that he instead made meals for himself using items bought from the commissary, walking there on crutches while other inmates carried his bags. (Pl.'s Dep. 28:6–21.) (Presumably the commissary was closer to Barber's cell than the cafeteria was, but neither side addresses this.) Barber also testified that, after his feed-in permit was denied, he had "feelings of hopelessness and helplessness," and it was those feelings, not knee pain, that hindered his daily activities. (*Id.* at 32:1-17.)

## ANALYSIS

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the burden of establishing that no material facts are in genuine dispute. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970). Any doubt as to the existence of a genuine issue is resolved against the moving party. *Id.*

---

[2] While Barber disputes this by saying that the comment that he was "recovering well" pertained to his mental health, they are clearly about his recovery from knee surgery. (Pl.'s Resp. to Sword SMF ¶ 22; Sword Affidavit Ex. 9 [60-2] at 24.)

The Eighth Amendment protects prisoners from officials' deliberate indifference to their serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A medical need is objectively serious if it "has been diagnosed by a physician as mandating treatment" or is "so obvious that even a lay person would perceive the need for a doctor's attention." *Perry v. Sims*, 990 F.3d 505, 511 (7th Cir. 2021) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). Establishing deliberate indifference "requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (quoting *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012)). Deliberate indifference constitutes the "unnecessary and wanton infliction of pain" that is "repugnant to the conscience of mankind" prohibited by the Eighth Amendment. *Estelle*, 429 U.S. at 105-106.

On this record, the court concludes that no reasonable jury could find that Sword was deliberately indifferent to an objectively serious medical need. Barber did not have a serious medical need to receive meals in his cell; even if he had, there is no evidence that Sword decided to revoke the feed-in permit out of deliberate indifference.

In reaching this conclusion, the court acknowledges that Barber's knee condition was objectively serious—the condition mandated treatment, and Barber in fact received extensive treatment: He was sent to UIC for surgery and had his post-surgery recovery closely managed in visits with nurses, doctors, physical therapists, and mental health providers. But Barber's claim is about the specific treatment decision by Sword that he did not need to be fed inside his cell. Thus, the question is not whether he had a serious knee injury, but rather whether that knee injury, which was indisputably being treated, gave rise to an objectively serious need to receive his meals in his cell, as opposed to in the cafeteria, or in the infirmary. The Defendants have shown there is no evidence that Barber had an objectively serious medical need to receive meals in his cell.

First, Barber's orthopedists treated his normal post-operative pain and never ordered him to remain immobile in his cell. They instructed him to "bear weight as tolerated, extend his right knee through as much range of motion (ROM) as tolerated, and use crutches for the post-

5

operative period." (Sword SMF ¶ 8.) These physicians' instructions demonstrate their judgment that Barber was able to walk with crutches. At a follow-up appointment on April 4, 2022, UIC orthopedists noted that Barber was ambulatory and that his pain and symptoms were normal considering his recent surgery. (*Id.* ¶ 14.) They prescribed pain medication and physical therapy. (*Id.*)

The court notes, further, Sword's offer to allow Barber to remain in the infirmary, where meals would be provided to him. Barber's refusal of that offer further undermines the notion that he had a serious need for meals in his cell. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) (inmates are "not entitled to demand specific care" nor are they "entitled to the best care possible"). He remained in the infirmary for just one day immediately following his surgery and then returned to his cell on his own request. Had he wanted to remain immobile and have meals brought to him, the infirmary was an option, but one he did not prefer.

Moreover, Barber has not adduced any evidence that the inability to receive meals in his cell complicated his recovery or exacerbated his pain. Barber testified that a physical therapist told him his post-surgical healing was delayed, but that statement is, of course, hearsay, and Barber offers no other specifics about the physical therapist's alleged views. (Sword SMF ¶ 28.) Nor does he offer corroboration for the physical therapist's statement, any evidence that Sword was aware of the physical therapist's purported views, or any support for the notion that the denial of a feed-in permit delayed his recovery. To the contrary, he told his mental health provider on April 16, 2022 that he was "recovering well," and on May 16, 2022 told the provider that he was no longer in pain and had recovered. (Sword SMF ¶¶ 20, 22.) He now testifies that not having a feed-in permit caused him to have feelings of hopelessness, and that it was those feelings, rather than his post-surgery pain, that limited his daily activities. Presuming that those unpleasant emotions are themselves evidence of an objectively serious medical need, Barber has not shown that Sword was aware of them.

Even if Barber could show he had an objectively serious need to receive meals in his cell, he could not show that Sword's decision to revoke his feed-in permit was a product of deliberate indifference. To do so, Barber would need to make a showing of "'something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rosario*, 670 F.3d at 821, citing *Collins v. Seeman,* 462 F.3d 757, 762 (7th Cir. 2006). No evidence in this record shows that the decision to deny Barber a feed-in permit was incorrect at all—much less an expression of total unconcern—in these circumstances, when Barber had been prescribed physical therapy (which would require him to be active) and when the UIC orthopedists had told him to bear weight on his leg and to use crutches.

Barber believes that Sword's indifference is evident from the fact that Dr. Sy issued a feed-in permit, and Sword revoked it the next day. (Pl.'s Resp. [83] 6–7.) But Barber testified that he saw Dr. Sy again after this visit with Defendant Sword and spoke with him about the feed-in permit, yet claims he does not remember what Dr. Sy said about the matter. (Pl.'s Dep. 32:18–33:4.) The memory gap is curious in this context. But it is undisputed that Barber remained without a feed-in permit after this conversation with Dr. Sy despite his having spoken to the physician about it; the only reasonable conclusion is that Sy concurred with Sword that it was unnecessary.

That leaves Barber's claim as against Defendant Moss, the food service supervisor who, according to Barber, "refused to honor" his feed-in permit. There is simply no evidence in support of this claim. Barber had a feed-in permit issued on April 6, and on April 7, Moss sent a breakfast tray to his cell. After Sword invalidated the permit, the meal deliveries stopped. As a non-medical member of the prison staff, Moss was "entitled to defer" to the medical staff's judgment that Barber did not need meals delivered to his cell. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). As explained above, the evidence does not support Barber's claim that he had a serious medical need for such meal deliveries; but even if he did, Moss was not responsible for the decision to grant or withhold a feed-in permit, and for the day it was in effect, he honored it. No reasonable jury could conclude otherwise. Moss is also entitled to summary judgment.

**CONCLUSION**

The Defendants' motions [59, 72] are granted, and the Clerk is directed to enter judgment in their favor and against Plaintiff. If Barber wishes to appeal, he must file a notice of appeal in this court within thirty days of entry of judgment and pay the $605.00 filing fee. FED. R. APP. P. 4(a)(1). If he seeks to pay the appellate filing fee with monthly deductions from his prison or jail trust account, as he is doing for this court's filing fee, he must file another *in forma pauperis* application in this court, providing not only a statement of his prison trust account, but also the issues he intends to raise on appeal. *See* 28 U.S.C. § 1915(a)(2); FED. R. APP. P. 24. If the Seventh Circuit dismisses Barber's appeal as meritless, he could receive a strike under § 1915(g).

ENTER:

Date: February 3, 2026

_____
REBECCA R. PALLMEYER
United States District Judge